# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
A white, 2014 Honda Ridgeline Truck (Target Vehicle 1), bearing Wisconsin license plate MV4100, as further described in Attachment A

Case No.23-996M(NJ)

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the Eastern District of Wisconsin *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 10/16/2023 *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m. ❒ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Hon. Nancy Joseph.
*(United States Magistrate Judge)*

❒ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❒ for ____ days *(not to exceed 30)* ❒ until, the facts justifying, the later specific date of ____________.

Date and time issued: 10/2/2023 @ 4:27 p.m.

*Judge's signature*

City and state: Milwaukee, WI

Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ________________

*Executing officer's signature*

*Printed name and title*

## ATTACHMENT A2

**Property to Be Searched**

A white**, 2014 Honda Ridgeline Truck**, bearing Wisconsin license plate MV4100, registered to Lot 31 LLC, 5616 Green Bay Rd #A, Kenosha, Wisconsin. **(Target Vehicle 1).**

## ATTACHMENT B

**Property to Be Seized**

1. All records, documents, evidence, and information relating to violations of Title 21, United States Code, Sections 841(a)(1), 843(b), and 846, and Title 18, United States Code, Section 1956, those violations involving Isaiah ALBRECHT-Facundo and Kendell BENJAMIN, and others known and unknown, and occurring after January 1, 2020, including:

   a. Controlled substances, including tablets, powder, liquids, and vape cartridges;
   b. Paraphernalia associated with the manufacture and distribution of controlled substances, including scales, measuring devices, weighing devices, packaging materials, and containers, bags, or boxes to hold or transport controlled substances;
   c. Proceeds of drug trafficking activities, such as currency, precious metals, financial instruments, jewelry, and documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds of drug trafficking activities;
   d. Bank account records, loan documents, wire transfer records, money order receipts, postal express mail envelopes, bank statements, safe deposit box keys and records, money containers, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the sale of controlled substances, or financial transactions related to the trafficking of controlled substances;
   e. Drug or money ledgers, drug distribution or customer lists, drug supplier lists, correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity, or times when controlled substances were obtained, transferred, sold, distributed, or concealed;
   f. Personal telephone books, address books, telephone bills, photographs, letters, cables, telegrams, facsimiles, personal notes, documents, and other items or lists reflecting names, addresses, telephone numbers, addresses and communications

regarding illegal activities among and between members and associates involved in drug trafficking activities;

g. Records of off-site storage locations, including but not limited to safe deposit box keys and records, and records and receipts and rental agreements for storage facilities;

h. Records and information related to travel for purposes of drug trafficking, such as passports, airline tickets, bus tickets, vehicle rental receipts, credit card receipts, taxicab receipts, hotel, and restaurant receipts, canceled checks, maps, and records of long-distance calls reflecting travel;

i. Indicia of occupancy, residency, or ownership of the premises and things described in the warrant, including utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease, or rental agreements, addressed envelopes, escrow documents, and keys;

j. Photographs, videotapes, or other records of assets, co-conspirators, or controlled substances;

k. Cellular telephones, text messaging systems, desktop computers, laptop computers, tablets, other communication devices, and electronic storage devices (including but not limited to thumb drives, compact discs, DVDs, floppy discs, external hard drives), and any and all records associated with and stored within such communications services or storage devices;

l. Records and information relating to a conspiracy to distribute, manufacture, dispense, or possess with the intent to manufacture, distribute, or dispense a controlled substance;

m. Records and information relating to the distribution, manufacture, dispensing, or possession with the intent to manufacture, distribute, or dispense a controlled substance;

n. Records and information relating to the use, dominion, and control of the above-described vehicles;

o. Records and information relating to the use, dominion, and control of **8360 28th Ave, Kenosha, Wisconsin**;

p. Records and information about customers, including lists of customers and related identifying information;

q. Records and information relating to the types, amounts, and prices of drugs imported, trafficked, and distributed as well as dates, places, and amounts of specific transactions;

r. Records and information relating to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

s. Safe deposit box keys, storage locker keys, safes, and related secure storage devices, and documents relating to the rental or ownership of such units;

t. currency counters;

u. Firearms, ammunition, magazines, cases, boxes, holsters, slings, gun pieces, gun cleaning items or kits, ammunition belts, original box packaging, targets, expended pieces of lead, and records, receipts, or other paperwork showing the purchase, storage, disposition, or dominion and control over firearms and ammunition; and

v. Computers (including cell phones) or storage media used as a means to commit the violations described above.

- For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

    a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h. evidence of the times the COMPUTER was used;

i. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k. records of or information about Internet Protocol addresses used by the COMPUTER;

l. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

m. contextual information necessary to understand the evidence described in this attachment.

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high-speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data), any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies), any handmade form (such as writing), and any mechanical form (such as printing or typing).

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

During the execution of the searches described in Attachments A, law enforcement personnel may require Isaiah ALBRECHT-Facundo and Kendell BENJAMIN to press their fingers (including thumbs) to the fingerprint sensor and/or to present his face to the facial recognition sensor, such as a camera, of the electronic device(s) found therein for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

A white, 2014 Honda Ridgeline Truck (Target Vehicle 1), bearing Wisconsin license plate MV4100, as further described in Attachment A.

Case No.23-996M(NJ)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the Eastern District of Wisconsin, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841(a)(1) & 846 | Possession with intent to distribute a controlled substance and conspiracy to possess with intent to distribute a controlled substance. |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of ______ days *(give exact ending date if more than 30 days:* ____________ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

THOMAS GROTH Digitally signed by THOMAS GROTH Date: 2023.09.29 16:33:26 -05'00'

*Applicant's signature*

Thomas Groth, DEA SA

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 10/2/2023

Nancy Joseph

*Judge's signature*

City and state: Milwaukee, WI

Honorable Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

# AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Thomas Groth, being first duly sworn, hereby depose and state as follows:

## I. BACKGROUND, TRAINING, AND EXPERIENCE

1. I am employed by the DEA and is an investigator/law enforcement officer of the United States who is empowered by law to conduct investigations and make arrests for offenses enumerated in Title 21, United States Code Section 841.

2. I have been a Special Agent with DEA since July 2017. From March 2017 to July 2017, I attended and completed the DEA 20-week training academy in Quantico, Virginia. While at the DEA training academy, I received instruction in investigative techniques, drug identification, physical surveillance, undercover negotiations, telecommunication investigations, and drug-related law. I have also received on-the-job training from supervisors, senior agents, and detectives regarding the manner in which drugs are trafficked and money is laundered.

3. I am currently assigned to the DEA Chicago, Illinois Field Division, Milwaukee District Office ("DEA Milwaukee Office"). Within the DEA Milwaukee Office, I am currently assigned to an enforcement group targeting drug traffickers operating within the DEA Milwaukee Office's area of responsibility. Prior to being assigned to the DEA Milwaukee Office, I was previously assigned to the DEA Phoenix, Arizona Field Division Office ("DEA Phoenix Office") for approximately five and half years. Within the DEA Phoenix Office, I was assigned to the Organized Crime Drug Enforcement Task Force ("OCDETF")/Strike Force, Group One ("OCDETF SF1"). The OCDETF SF1 is tasked with disrupting and dismantling major drug-trafficking organizations through the collaborative investigative efforts of federal, state, and local law enforcement agencies.

4. Prior to being employed by the DEA, I was employed as a Police Officer with the Kenosha Police Department in Kenosha, Wisconsin for approximately five years. Before being hired by the Kenosha Police Department, I completed a 16-week training academy at the Great Oaks Police Academy in Cincinnati, Ohio.

5. I have a Bachelor of Science degree in Criminal Justice from Xavier University in Cincinnati, Ohio.

6. By virtue of my employment as a Special Agent and prior law enforcement experience, I have performed various tasks, which include, but are not limited to: (a) involvement in numerous investigations into illegal drug distribution conspiracies, participating in multiple arrests of individuals for drug related offenses, and participating in the service of multiple drug-related search warrants; (b) functioning as a surveillance agent, thus observing and recording movements of persons trafficking in drugs and those suspected of trafficking in drugs; (c) interviewing witnesses, confidential sources (CS) and sources of information (SOI) relative to the illegal trafficking of drugs and the distribution of monies and assets derived from the illegal trafficking of drugs (laundering of monetary instruments); and (d) functioning as a case agent, entailing the supervision of specific investigations involving the trafficking of drugs; and working with prosecutors to provide useful courtroom testimony.

7. In the course of conducting drug investigations, I have personally interviewed persons involved in the distribution of illegal drugs. I have become aware of techniques and practices used by narcotics traffickers to avoid detection by law enforcement. Among these techniques are the use of counter surveillance, multiple locations at which to conduct narcotics related activities, hidden compartments in vehicles used to conceal narcotics and currency, pay phones, mobile telephones, voice mail, texting, instant messaging, email, and the use of

numerous associates and "workers" to further their criminal organization. I have learned the various techniques individuals use to conceal the source or nature of drug proceeds. Among the techniques utilized are the purchase of assets and financial instruments in nominee names using cash and "structuring" transactions so as to avoid certain reporting requirements of financial institutions. My training and experience include the following:

a. Through informant interviews and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations finance, source, purchase, transport, and distribute controlled substances in Wisconsin, throughout the United States, and internationally.

b. I have used my training and experience to locate, identify, and seize multiple types of narcotics, drugs, drug proceeds, and drug contraband.

c. I have also relied upon informants to obtain controlled substances from drug traffickers and have made undercover purchases of controlled substances.

d. I am familiar with the language used over the telephone and other electronic communications to discuss drug trafficking and know that the language is often limited, guarded, and coded. I know the various code names used to describe controlled substances. I also know that drug traffickers often use electronic devices (such as computers and cellular phones), electronic communication services (such as e-mail and messaging services), and social media to facilitate these crimes.

e. I know drug traffickers often register phones, mailboxes, bank accounts, electronic communication services, and other instrumentalities of drug trafficking in the names of others, also known as nominees, to distance themselves from instrumentalities used to facilitate drug trafficking.

f. I know that drug traffickers often keep documents and records about the transportation, sourcing, ordering, sale, and distribution of controlled substances.

g. I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry. I also know that drug traffickers often use nominees to purchase or title these assets to avoid scrutiny from law enforcement officials. I know that drug traffickers often secure drug proceeds at locations within their

dominion and control, such as their residences, businesses, and storage facilities, and in safes or other secure containers.

h. I know that drug traffickers often attempt to protect and conceal drug proceeds through money laundering, including but not limited to domestic and international banks, securities brokers, service professionals such as attorneys and accountants, casinos, real estate, shell corporations, business fronts, and otherwise legitimate businesses which generate large quantities of currency. I know it is common for drug traffickers to obtain, secrete, transfer, conceal, or spend drug proceeds, such as currency, financial instruments, precious metals, gemstones, jewelry, books, real estate, and vehicles. I know it is common for drug traffickers to maintain documents and records of these drug proceeds, such as bank records, passbooks, money drafts, transaction records, letters of credit, money orders, bank drafts, titles, ownership documents, cashier's checks, bank checks, safe deposit box keys, money wrappers, and other documents relating to the purchase of financial instruments or the transfer of funds. I know drug traffickers often purchase or title assets in fictitious names, aliases, or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies. I know that even though these assets are titled or purchases by nominees, the drug traffickers actually own, use, and exercise dominion and control over these assets. The aforementioned books, records, receipts, notes, ledgers, and other documents are often maintained where the traffickers have ready access. These may be stored in hard copy or soft copy on paper, computers, cellular devices, and other electronic media or electronic storage devices.

i. I know drug traffickers maintain large amounts of currency, including in readily accessible financial accounts, to finance their ongoing drug business. I know that those involved in drug trafficking or money laundering keep records of their transactions. Because drug trafficking generates large sums of cash, drug traffickers often keep detailed records about the distribution of narcotics and the laundering of proceeds. I also know that drug trafficking and money laundering activities require the cooperation, association, and communication between and among a number of people. As a result, people who traffic in narcotics or launder money for such

organizations possess documents that identify other members of their organization, such as telephone books, address books, handwritten notations, telephone bills, and documents containing lists of names and addresses of criminal associates. Such records also provide information about the identities of co-conspirators who launder money and traffic drugs. I also know that drug traffickers commonly maintain addresses or telephone numbers which reflect names, addresses, or telephone numbers of their drug trafficking and money laundering associates in hard copy and soft copy on papers, books, computers, cellular devices, and other electronic media or electronic storage devices.

j. I know that the sale of controlled substances generates large quantities of United States currency in small denominations. It is common for drug dealers to physically handle and count the money after receiving it in exchange for the controlled substances, thereby leaving traces of controlled substances on the money. It is common for drug dealers to separate their money by denomination and put this currency in rubber banded stacks in varying increments to facilitate quick counting. Small and medium denominations of questionable currency, along with the manner in which the currency is handled, carried, and concealed may establish probable cause that there is a substantial connection between the questionable currency and drug transactions. The Currency Transaction Report (CTR) (IRS Form 4789), which must be completed and filed with the Internal Revenue Service by all financial institutions on every currency transaction which exceeds $10,000, causes issues for drug traffickers when they attempt to negotiate their illegal profits at a financial institution. To evade the filing of a CTR, drug traffickers often structure their currency transactions so that no single transaction exceeds $10,000 or they provide false or misleading information in an attempt to legitimize or conceal the source or ownership of the currency. To legitimize their spending, drug traffickers often file tax returns reporting income consistent with the amount of money which they believe can be traced and documented by the government. The source of income reported on these returns is usually falsely stated, misleading, or generic. Retained copies of these returns are commonly kept by the drug traffickers in their

residences, businesses, and other locations under the dominion and control of drug traffickers.

k. I know that drug traffickers commonly have in their possession, that is on their person, at their residences and in their vehicles, firearms, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machineguns and other weapons. Those firearms are used to protect and secure the drug traffickers' money and drugs.

l. I know drug traffickers often use electronic devices, such as telephones, cellular devices, computers, and currency counting machines to generate, transfer, count, record, or store the information described above and conduct drug trafficking and money laundering. I am familiar with computers, cellular devices, pagers, and other electronic media or electronic storage devices and their uses by drug traffickers to communicate with suppliers, customers, co-conspirators, and fellow traffickers. These devices often contain evidence of illegal activities in the form of communication records, voicemail, email, text messages, video and audio clips, location information, business records, and transaction records. I know drug traffickers take, store, preserve, or maintain photographs or videos of themselves, their associates, their property, their drugs, and their drug proceeds. These traffickers usually maintain these photographs or videos on computers, cellular devices, and other electronic media or electronic storage devices. Based upon my training and experience, I know that computer hardware and software may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of crime; and (2) the objects may have been used to collect and store information about crimes. I know the following information can be retrieved to show evidence of use of a computer or smartphone to further the drug trade: system components, input devices, output devices, data storage devices, data transmission devices, and network devices and any data contained within such systems; computer media and any data contained within such media; operating system software, application or access program disks, manuals, books, brochures, or notes, computer access codes, user names, log files, configuration files, passwords, screen names, email addresses, IP addresses, and SIM cards.

m. I have participated in numerous drug trafficking investigations involving the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these devices. This has led to evidence of the crimes under investigation and corroborated information already known or suspected by law enforcement. I have regularly used electronic evidence to find proof relating to the commission of criminal offenses, including intent, motive, manner, means, and the identity of suspects and conspirators.

n. Based on my training and experience, I know that cell phones are necessary for drug traffickers to conduct their business to communicate with suppliers and customers. I also know that cell phone data is often downloaded to computers. Thus, I believe cell phones and computers will be located at places controlled by drug traffickers and that a search of these electronic devices will reveal evidence of drug dealing.

8. I have also participated in the execution of numerous premises search warrants and arrests, where controlled substances, firearms, drug paraphernalia, drug proceeds, electronic devices, and records relating drug trafficking and drug proceeds were seized.

9. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

10. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a)(1) and 846 (possession with intent to distribute a controlled substance and conspiracy to possess with intent to distribute a controlled substance) have been committed, are being committed, and will be committed by Isaiah ALBRECHT-Facundo, and others not yet identified. There is also probable cause to believe that Isaiah ALBRECHT-Facundo's residence, **8360 28th Ave, Kenosha, WI (Target Location)**, will

constitute evidence of those criminal violations and will lead to the identification of additional individuals who are engaged in the commission of these offenses.

## II. LOCATION FOR WHICH A SEARCH WARRANT IS SOUGHT

11. The target location listed below is located in the Eastern District of Wisconsin, and more particularly described in Attachment's A1, A2, and A3.

A1. The residence at **8360 28th Ave, Kenosha, Wisconsin (Target Location)** and associated detached garage. The residence is described as a single-story residence, with the front door of the residence facing east and a driveway on the northside of the residence. The residence is light (white or light greyish) in color with brown shutters around the windows, a black roof, and the numbers "8360" vertical next to the front door of the residence.

A2. A white**, 2014 Honda Ridgeline Truck (Target Vehicle 1)**, bearing Wisconsin license plate MV4100, registered to Lot 31 LLC, 5616 Green Bay Rd #A, Kenosha, Wisconsin.

A3. A white, **2013 Lexus GS (Target Vehicle 2)**, bearing Wisconsin license plate ASE2631, registered to Tonya TAYLOR at 5618 34th Avenue, Kenosha, Wisconsin

## III. PROBABLE CAUSE

12. Since April 2023, investigators have been investigating the drug trafficking activities of Isaiah ALBRECHT-Facundo (ALBRECHT-Facundo), and others. Based on information from a confidential source (CS), investigators identified the ALBRECHT-Facundo

DTO as an organization that coordinates the distribution of cocaine throughout Kenosha, Wisconsin.[1]

13. In April 2023, DEA investigators, along with a Kenosha Police Department (KPD) Special Investigations Unit (SIU) Detective and a KPD SIU gang officer, debriefed a source of information (SOI-1) regarding the drug trafficking activities of ALBRECHT-Facundo. A lot of the information provided by SOI-1 was historical information going as far back as 3 years ago. However, SOI-1 indicated that based on his/her conversations with various people still closely associated with ALBRECHT-Facundo that the majority of the historical information provided by SOI-1 is still accurate.

14. During the debriefing, SOI-1 indicated that he/she previously knew ALBRECHT-Facundo to distribute kilogram quantities of cocaine in Kenosha, WI and believes ALBRECHT-Facundo to still be distributing cocaine. SOI-1 did not know exactly how much ALBRECHT-Facundo was distributing but stated that ALBRECHT-Facundo was getting at least one kilogram at a time. SOI-1 also stated that ALBRECHT-Facundo lives near Tremper High School in Kenosha (later determined to be **8360 28th Avenue, Kenosha, WI (Target Location)**), has a four-foot-tall safe in his house, switches cars frequently and was in the process of getting his commercial driver's license. Additionally, SOI-1 stated that ALBRECHT-Facundo was known to previously run a towing business called On-Demand Towing, however, SOI-1 stated that ALBRECHT-Facundo was using the business as cover to go to Chicago to pick up kilograms of cocaine.

[1] Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

15. SOI-1 has been providing information to investigators since approximately April 2023. SOI-1 is providing information in exchange for monetary compensations, does not have pending charges and has no criminal history. The information provided by SOI-1 has been independently corroborated and deemed accurate by investigators. As such, investigators believe SOI-1 to be truthful.

***Purchase of Cocaine from Isaiah ALBRECHT-Facundo***

16. In June 2023, investigators cultivated a different confidential source (CS-1) with direct knowledge of ALBRECHT-Facundo's drug trafficking activities. CS-1 stated that ALBRECHT-Facundo currently sells multiple ounces of cocaine at a time, on a regular basis, but believes ALBRECHT-Facundo gets multiple kilograms of cocaine at a time. In addition to providing other information, CS-1 identified ALBRECHT-Facundo's residence as **8360-28th Avenue, Kenosha, WI (Target Location).**

17. CS-1 has been providing information to investigators since approximately June 2023. CS-1 is providing information in exchange for consideration in potential future charges of possession with intent to distribute cocaine and carrying a concealed weapon. CS-1 is not being provided any monetary compensation. CS-1's criminal history includes convictions for disorderly conduct, misdemeanor bail jumping, criminal damage to property, and motor vehicle traffic offenses. The information provided by CS-1 was voluntarily provided by CS-1 against his/her penal interests, has been independently corroborated and deemed accurate. As such, investigators believe CS-1 to be truthful.

18. Following the debriefing, in June 2023, under the direction of investigators, CS-1 arranged to purchase 5 ounces of cocaine from ALBRECHT-Facundo in Kenosha, WI for $4,000.00 of United States Currency (USC). Case agents met with CS-1 at a previously

determined location prior to the purchase, and searched CS-1 and his/her car for drugs, weapons, money or any other contraband with negative results. Investigators equipped CS-1 with audio and video recording devices and money to purchase the cocaine. At the same time that this meeting was occurring, SIU investigators established surveillance at the pre-determined buy location, as well as, at **8360 28th Avenue, Kenosha, WI (Target Location)**. Shortly after CS-1 arrived at the pre-determined buy location, SIU investigators observed a male matching the description of ALBRECHT-Facundo, exit the front door of **8360 28th Avenue, Kenosha, WI (Target Location)** and walk towards the rear of the residence and ultimately out of view. SIU investigators did not observe any other subjects exit **8360 28th Avenue, Kenosha, WI (Target Location)** during this time. Shortly after losing sight of ALBRECHT-Facundo, SIU investigators observed a white Honda Ridgeline **(Target Vehicle 1)**, parked in the driveway of **8360 28th Avenue, Kenosha, WI (Target Location),** back out of the driveway and travel north on 28th Avenue, and then east on 83rd Street towards the pre-determined meeting location. Because the pre-determined meeting location was only approximately one mile from **8360 28th Avenue, Kenosha, WI (Target Location)**, investigators did not follow ALBRECHT-Facundo as he traveled to the meeting site. However, investigators did establish surveillance along the most-likely route of travel and observed ALBRECHT-Facundo traveling towards the pre-determined meeting location along that route. A few seconds later, investigators observed ALBRECHT-Facundo subsequently arrive at the pre-determined meeting location in a white Honda Ridgeline **(Target Vehicle 1)**. Given the short distance between the meeting location and **8360 28th Avenue, Kenosha, WI (Target Location)**, as well as how quickly ALBRECHT-Facundo reached the meeting location after leaving the residence, investigators do not believe

ALBRECHT-Facundo stopped at any other locations after leaving **8360 28th Avenue, Kenosha, WI (Target Location)** and before arriving at the meeting location.

19. After ALBRECHT-Facundo arrived at the meeting location, ALBRECHT-Facundo met with CS-1, ultimately providing CS-1 with a clear, plastic, sandwich sized bag containing a white powdery substance in exchange for the buy money. After the transaction, both CS-1 and ALBRECHT-Facundo left the meeting location (in separate cars). Some investigators followed ALBRECHT-Facundo, who traveled away from the meeting location and did not immediately return to **8360 28th Avenue, Kenosha, WI (Target Location)**. Investigators eventually terminated surveillance on ALBRECHT-Facundo as he continued to travel away from **8360 28th Avenue, Kenosha, WI (Target Location)**. Simultaneous to following ALBRECHT-Facundo, different investigators followed CS-1 back to a pre-determined location. At the pre-determined location, investigators retrieved the suspected cocaine from CS-1. SIU investigators then searched CS-1 and his/her vehicle for additional drugs, weapons, money, or other contraband with negative results, and collected the audio and video recording devices. SIU investigators later tested a small sample of the suspected cocaine, which resulted in a positive indication for cocaine. The total weight of the cocaine was 141.3 grams.

20. Investigators later reviewed the audio and video recordings from the controlled purchase, and observed that ALBRECHT-Facundo was the person that provided the cocaine to CS-1. As a result, I believe that ALBRECHT-Facundo delivered the cocaine to CS-1 in June 2023, utilizing the white Honda Ridgeline **(Target Vehicle 1)** to facilitate the transaction. Likewise, because ALBRECHT-Facundo was observed exiting **8360 28th Avenue, Kenosha, WI (Target Location)** prior to the deal and ALBRECHT-Facundo did not appear to stop anywhere prior to providing the cocaine to CS-1, I believe that the cocaine provided to CS-1 was

stored at **8360 28th Avenue, Kenosha, WI (Target Location).** Based on training, experience, and conversations with other experienced law enforcement officers, I know residences are commonly utilized to store drugs, money and/or other illicit items related to drug trafficking. I believe that evidence of ALBRECHT-Facundo's illegal activities will be discovered inside **8360 28th Avenue, Kenosha, WI (Target Location)**. I know, through training and experience, that individuals involved in narcotics trafficking and/or money laundering frequently utilize residences to store illegal drugs, U.S. Currency, keep documents, drug ledgers, scales and other items involved in drug trafficking. Additionally, I know that while drugs come and go from residences frequently, items such as documents, U.S. Currency, drug ledgers, scales, firearms, safes and other items utilized in drug trafficking and/or money laundering can remain at residences for extended periods of time. I know from training, experience and conversations with other law enforcement officers, that the above-mentioned equipment, paraphernalia, records and assets are of evidentiary value in the prosecution of persons for sale, distribution and possession of illegal drugs and/or money laundering. Furthermore, I know from training and experience that USC is frequently utilized as a method of payment for illegal drugs. Additionally, I know, from training and experience, that this USC may contain the odors of illegal narcotics due to its close proximity with the illegal narcotics. I also know that all of these items can be kept in drug trafficker's homes and/or in their vehicles. As further described below, I know that ALBRECHT-Facundo has at least one safe and has been known to be in possession of large amounts of USC.

***First Authorization to Utilized GPS Monitoring of the white Honda Ridgeline (Target Vehicle 1) Used by Isaiah ALBRECHT-Facundo***

21. Following the controlled purchase, in July 2023, the Honorable Nancy Joseph, United States Magistrate Judge in and for the Eastern District of Wisconsin, signed a tracking

warrant (23-956M(NJ)) for the aforementioned white Honda Ridgeline **(Target Vehicle 1)**. However, investigators were not able to install the tracker in the authorized installation period due to it being parked (and not driven) under a security camera at **8360 28th Avenue, Kenosha, WI (Target Location)** during the entire installation period.

***Surveillance on July 18, 2023***

22. On July 18, 2023, in an attempt to get the tracking device installed on the white Honda Ridgeline **(Target Vehicle 1)**, investigators were conducting surveillance at **8360 28th Avenue, Kenosha, WI (Target Location)**. It was during that time that investigators observed a subject later identified as Kendell BENJAMIN (confirmed through a Wisconsin Driver's License photograph) (BENJAMIN) at **8360 28th Avenue, Kenosha, WI (Target Location)**. Based on pattern of life observations, investigators believe that BENJAMIN is living at the residence at **8360 28th Avenue, Kenosha, WI (Target Location)** with ALBRECHT-Facundo. This is because BENJAMIN has been seen at the residence by investigators any time physical surveillance is conducted on the residence, which is not conducted daily but is done fairly regularly. In addition to this, investigators have observed a white, 2013 Lexus bearing a Wisconsin license plate of ASE2631 **(Target Vehicle 2)** at **8360 28th Avenue, Kenosha, WI (Target Location)** on an almost daily basis, and at a wide range of hours of the day and night. The 2013 Lexus **(Target Vehicle 2)** has previously been identified as being associated with BENJAMIN based on his having been stopped while operating this vehicle, and being the sole occupant, on three previous occasions. As a result of this, investigators believe that BENJAMIN is the primary user of the 2013 Lexus **(Target Vehicle 2)** and given its regular presence at **8360 28th Avenue, Kenosha, WI (Target Location)**, investigators believe BENJAMIN to be residing with ALBRECHT-Facundo at **8360 28th Avenue, Kenosha, WI (Target Location)**.

23. Historical DEA reporting indicates that BENJAMIN was ALBRECHT-Facundo's cocaine source of supply. In particular, in March 2020, DEA Milwaukee investigators debriefed a DEA confidential source (CS-2) regarding individuals involved in distributing Percocet, Alprazolam, cocaine, MDMA, and marijuana in Kenosha. During the debrief, CS-2 stated "Kendall BENJAMIN" is "ALBRECHT-Facundo's cocaine source of supply." Likewise, CS-2 stated that BENJAMIN was arrested in March of 2019 for drug related charges in Kenosha County. Queries of the Wisconsin Circuit Court Access revealed that in 2017, BENJAMIN was sentenced, following his guilty plea to Possession with Intent to Distribute – THC and Possession of a Dangerous Weapon by Person under 18 years of age. Likewise, in 2018, BENJAMIN was sentenced following his guilty plea to Possession with Intent to Distribute – THC. Moreover, in 2019, BENJAMIN was sentenced following his guilty plea to Possession with Intent to Distribute – Cocaine (15-40g). All of the aforementioned cases occurred in Wisconsin State Court, in particular in Kenosha County.

24. After reviewing the historical reporting of CS-2, investigators spoke to the DEA investigators who interviewed CS-2. Since the debriefing occurred in 2020, investigators were unable to recall who CS-2 was and thus was unable to provide access for further interview or verification of the information provided. With that said, however, based on CS-2's accuracy in regard to BENJAMIN's arrest, I believe CS-2 was at least knowledgeable of BENJAMIN's drug trafficking activities, at that time. Furthermore, based on the additional information documented in the remainder of this affidavit, I believe that even if BENJAMIN is not ALBRECHT-Facundo's source of supply, that BENJAMIN continues to be involved in drug trafficking in Kenosha, WI and is likely a co-conspirator with ALBRECHT-Facundo.

25. As previously noted, investigators were conducting surveillance at **8360 28th Avenue, Kenosha, WI (Target Location)** on July 18, 2023. While conducting surveillance, investigators observed BENJAMIN approach the 2013 Lexus **(Target Vehicle 2)**, open the trunk, reach in, and appear to be manipulating items. BENJAMIN then closed the trunk, approached the passenger side of the 2013 Lexus **(Target Vehicle 2)**, and then stood by the area of the front passenger door. Investigators could not see what exactly BENJAMIN was doing while he was standing there. BENJAMIN then walked back into **8360 28th Avenue, Kenosha, WI (Target Location)** through the front door.

26. A short time later, investigators observed a white SUV with tinted windows pull up and park in front of **8360 28th Avenue, Kenosha, WI (Target Location)**. Investigators observed a Hispanic male exit the SUV and walk towards the driveway of **8360 28th Avenue, Kenosha, WI (Target Location)**. The Hispanic male (of whom a photograph was taken), who did not appear to be carrying anything, walked up the right side of the driveway, past the passenger side of several other cars, and stopped by the passenger side of the 2013 Lexus **(Target Vehicle 2)**. This was very close to the area where BENJAMIN was observed standing after appearing to move items in the trunk. The Hispanic male was only in this spot for a brief period of time before he began to walk back down the driveway towards the street, but now with a medium sized black bag. The Hispanic male then returned to the SUV and entered the driver side of the SUV still carrying the bag. Investigators observed that the Hispanic male did not attempt to contact anyone inside of **8360 28th Avenue, Kenosha, WI (Target Location)**.

27. As the Hispanic male drove off, investigators initiated surveillance and attempted to follow the SUV but due to traffic, lost the vehicle. Surveillance was then terminated.

28. A records check of Wisconsin DOT records associated with the SUV revealed that it was registered to Angelo M. GONZALES. Investigators looked at the surveillance photograph of the Hispanic male and a driver's license photograph of GONZALES and believe that the Hispanic male seen retrieving the bag was GONZALES.

29. Based on training and experience, I believe that this short contact occurred so that GONZALES could pick up drugs. As previously documented, investigators believe, based on the controlled purchase, that **8360 28th Avenue, Kenosha, WI (Target Location)** is being utilized by ALBRECHT-Facundo to store and distribute drugs. Additionally, based on the actions of BENJAMIN, his criminal history and CS-2's historical information, I believe that BENJAMIN is a co-conspirator of ALBRECHT-Facundo and also distributing drugs. As such, BENJAMIN is also utilizing **8360 28th Avenue, Kenosha, WI (Target Location),** and the vehicles associated with the residence to store and distribute drugs. Given this, I believe that drugs were transferred from the trunk of the 2013 Lexus **(Target Vehicle 2)** to the passenger compartment of the 2013 Lexus **(Target Vehicle 2)** so that GONZALES could access them without needing keys to the vehicle. At times, drug transactions are conducted without actual person to person contact so as to provide a level of compartmentalization. That is to say, it makes it so that should law enforcement appear during a transaction, law enforcement would not be able to observe both parties' participation in the delivery. Moreover, I am aware, based on training and experience, that individuals involved in drug trafficking are frequently involved in short term contacts, and only in the area so long as necessary to complete the transaction. Because GONZALES was seen carrying a bag away from **8360 28th Avenue, Kenosha, WI (Target Location),** a location known to store drugs, it was very quickly done, and BENJAMIN previously appeared to be moving items around in the same location where GONZALES later

retrieved the bag, I believe GONZALES picked up drugs and ALBRECHT-Facundo and BENJAMIN are not only utilizing **8360 28th Avenue, Kenosha, WI (Target Location)** but vehicles parked within the curtilage of the property, in particular **Target Vehicle 1** and **Target Vehicle 2**, to assist with their drug trafficking activities.

***Second Authorization to Utilized GPS Monitoring of the white Honda Ridgeline (Target Vehicle 1) Used by Isaiah ALBRECHT-Facundo***

30. On August 4, 2023, the Honorable William E. Duffin, United States Magistrate Judge in the Eastern District of Wisconsin, signed a tracking warrant (23-MJ-136) for the white Honda Ridgeline **(Target Vehicle 1)**. On August 5, 2023, investigators successfully installed the mobile tracking device (MTD) on the white Honda Ridgeline **(Target Vehicle 1)** and began monitoring the data later that same day. The warrant has since expired, and investigators are no longer monitoring the activities of the white Honda Ridgeline **(Target Vehicle 1)** through the MTD. During the authorized tracking period, ALBRECHT-Facundo did not utilize the white Honda Ridgeline **(Target Vehicle 1)** very frequently. This is believed to be because ALBRECHT-Facundo recently received his commercial driver's license and has been traveling out of town in an 18-wheel truck.

31. Despite it not being driven very frequently, three days after the MTD was installed, investigators noted that the white Honda Ridgeline **(Target Vehicle 1)** had left **8360 28th Avenue, Kenosha, WI (Target Location)** and traveled directly to a gas station in Kenosha, WI. Investigators located the white Honda Ridgeline **(Target Vehicle 1)** in the parking lot of the gas station and observed ALBRECHT-Facundo sitting in the driver's seat of the white Honda Ridgeline **(Target Vehicle 1)** and did not observe anyone else in the white Honda Ridgeline **(Target Vehicle 1)**. Investigators also observed the white Honda Ridgeline **(Target Vehicle 1)** was parked at the gas pumps and did not observe anyone else at the white Honda Ridgeline

**(Target Vehicle 1)** or near the white Honda Ridgeline **(Target Vehicle 1)**. During ALBRECHT-Facundo's time at the gas station, investigators did not observe anyone approach or walk away from the white Honda Ridgeline **(Target Vehicle 1)**.

32. Shortly after arriving, investigators observed the white Honda Ridgeline **(Target Vehicle 1)** leave the gas station, and with the assistance of the MTD, followed the white Honda Ridgeline **(Target Vehicle 1)** to the 1800 block of 58th Street in Kenosha, WI. The 1800 block of 58th Street is a unique street in Kenosha in that it is not very long and dead-ends on either end, making it nearly impossible to establish surveillance without being seen. Investigators attempted to get a visual on the white Honda Ridgeline **(Target Vehicle 1)**, however, investigators were unable to do so without being spotted by ALBRECHT-Facundo and had to conduct periodic spot checks on the white Honda Ridgeline **(Target Vehicle 1)**. During the spot checks, investigators did observe the white Honda Ridgeline **(Target Vehicle 1)** parked on the south side of 58th Street. Investigators were unable to see if ALBRECHT-Facundo, or anyone else was inside the white Honda Ridgeline **(Target Vehicle 1)**.

33. Approximately 3 minutes after arriving in the area, the MTD indicated that the white Honda Ridgeline **(Target Vehicle 1)** was no longer in the 1800 block of 58th Street. Investigators then followed, with the assistance of the MTD, the white Honda Ridgeline **(Target Vehicle 1)** directly back to **8360 28th Avenue, Kenosha, WI (Target Location)**. At **8360 28th Avenue, Kenosha, WI (Target Location)**, investigators observed the white Honda Ridgeline **(Target Vehicle 1)** park directly in front of **8360 28th Avenue, Kenosha, WI (Target Location)**, ALBRECHT-Facundo exit the white Honda Ridgeline **(Target Vehicle 1)** alone and enter **8360 28th Avenue, Kenosha, WI (Target Location)** through the front door. Investigators observed ALBRECHT-Facundo appeared to be utilizing his cellular telephone as he was entering

the residence. Investigators did not observe ALBRECHT-Facundo carrying anything leading investigators to believe he did not pick up anything during his brief stop.

34. Based on training, experience, and conversations with other experienced law enforcement officers, I believe that ALBRECHT-Facundo traveled to the 1800 block of 58th Street for the purpose of conducting a drug transaction. While investigators did observe ALBRECHT-Facundo stop at a gas station after leaving **8360 28th Avenue, Kenosha, WI (Target Location),** investigators did not see ALBRECHT-Facundo meet with anyone at that location and believe ALBRECHT-Facundo was just getting gas. Furthermore, after then traveling to the 1800 block of 58th Street, ALBRECHT-Facundo only spent approximately 3 minutes at that location before returning to **8360 28th Avenue, Kenosha, WI (Target Location).** Given the unique circumstances of ALBRECHT-Facundo's traveling to a location where he only remained for approximately three minutes, I believe that ALBRECHT-Facundo, a known drug dealer, went to the 1800 block of 58th Street, a known high crime area and street difficult for law enforcement to conduct surveillance at, to deliver drugs. I am aware that drug traffickers frequently deliver drugs at the request of customers, only spending the necessary amount of time at a given location to complete the transaction, before immediately leaving the area. Likewise, because I know that drug traffickers frequently utilize residences to store drugs, and I believe that ALBRECHT-Facundo utilizes **8360 28th Avenue, Kenosha, WI (Target Location)** to store his drugs, I believe that the drugs that were delivered in the 1800 block of 58th Street came from **8360 28th Avenue, Kenosha, WI (Target Location).**

***Return of Search Warrant Served on Snapchat Account Utilized by Isaiah ALBRECHT-Facundo***

35. On August 10, 2023, the Honorable Nancy Joseph, United States Magistrate Judge in and for the Eastern District of Wisconsin, authorized the search and seizure of data

relating to the Snapchat account with the username of "izayzay12" (23-985M(NJ), a snapchat account known to be utilized by ALBRECHT-Facundo. Investigators subsequently served the warrant on Snapchat who responded to the warrant on August 28, 2023. Snapchat provided a large database of information (dating back to 2016) and investigators are continuing to go through the data, however, to date, investigators have located several pictures, videos, and chat messages indictive of drug distribution and/or money laundering. When Snapchat provided the responsive data, Snapchat also included guides on how to decipher the information and identify who sent/received the data, amongst other things. The following some examples verifying ALBRECHT-Facundo is not only involved in drug trafficking but is also utilizing **8360 28th Avenue, Kenosha, WI (Target Location)** to store and facilitate his drug trafficking activities. The following examples are only from January 1, 2023, to present, but additional drug trafficking related information dating farther back is also present.

- On January 1, 2023, ALBRECHT-Facundo sent two videos of a bag of a leafy green substance. Based on training and experience, the substance appeared to be marijuana. In the first video the bag was still sealed, but in the second video the bag was open. The pictures below are screenshots from the videos.




- On April 20, 2023, ALBRECHT-Facundo sent multiple pictures and a video of at least two brick shaped packages of a white powdery substance. Based on training and experience, investigators believe the packages to be kilograms of cocaine. Below is a picture of the kilograms that ALBRECHT-Facundo sent.




Of note in that picture is the lower right corner of the picture. In particular, investigators noted that the flooring appeared to be a distinct white tile flooring with a black/grey smoke-like design on it. This is noteworthy because on May 4, 2023, ALBRECHT-Facundo sent a picture of a what appeared to be a kitchen with the same unique flooring design. Investigators subsequently sent the picture of the kitchen, with no identifying information, to SOI-1 asking if SOI-1 had ever seen that location. SOI-1 confirmed that the picture was of ALBRECHT-Facundo's kitchen at **8360 28th Avenue, Kenosha, WI (Target Location).** As a result, investigators believe the kilograms of cocaine photographed on April 20, 2023 were in **8360 28th Avenue, Kenosha, WI (Target Location).** A picture of the kitchen is below.



- On May 4th, in addition to the kitchen picture documented above, ALBRECHT-Facundo also sent several pictures of what appeared to be the basement of a residence. Of note, in multiple pictures was BENJAMIN, including one of BENJAMIN in what appeared to be a bedroom. Additionally, another picture depicted BENJAMIN, a "Sentrysafe" brand safe and an unknown brand money counter. I am aware, based on training and experience, that individuals involved in drug trafficking frequently utilize safes to store drugs, drug paraphernalia and money derived from the sale of drugs. SOI-1 had previously provided pictures of a tall safe which SOI-1 indicated ALBRECHT-Facundo utilizes to store his drugs in **8360 28th Avenue, Kenosha, WI (Target Location).** Investigators noted that the safe in the basement picture was different than the picture previously provided by SOI-1. However, I am aware that individuals involved in drug trafficking are frequently in possession of large amounts of USC derived from the sale of drugs. I am also aware that drug traffickers frequently utilize money counters to assist with counting bulk United States Currency from drug sales. Likewise, I am also aware that drug traffickers

frequently utilize safes (or a similar secure storage device) to store bulk United States Currency from drug sales, along with firearms, ledgers, drugs and/or other items of evidentiary value. I believe, based on the aforementioned information that there are multiple safes within 8360 28th Avenue, Kenosha, WI (Target Location). As such, I believe there is probable cause to search the interior of any and all safes (including through forced entry into said safes) located within 8360 28th Avenue, Kenosha, WI (Target Location), Target Vehicle 1, and/or Target Vehicle 2, as further documented in Attachment B. A copy of the basement picture with the safe and money counter are below.



- On both May 20, 2023 and May 21, 2023, ALBRECHT-Facundo sent a message to a person using the Snapchat chat function. The messages stated "8360 28th ave Kenosha WI" and "8360 28th Ave". Investigators believe these chats are reference to ALBRECHT-Facundo's address of **8360 28th Avenue, Kenosha, Wisconsin. (Target Location)**. As previously noted, on June 27, 2023, investigators conducted a controlled purchase of cocaine from ALBRECHT-Facundo, and during that time ALBRECHT-Facundo was observed exiting **8360 28th Avenue, Kenosha, Wisconsin. (Target Location).**
- On July 9, 2023, a video was sent by ALBRECHT-Facundo depicting an unknown man and woman walking down a hallway of what appeared to be an apartment complex or hotel. While ALBRECHT-Facundo was not in the video, a video sent at approximately the same time (but unknown if it was before or after the aforementioned video) depicted ALBRECHT-Facundo in the same hallway leading investigators to believe ALBRECHT-Facundo took the video. This is noteworthy because in the video without ALBRECHT-Facundo, the unknown man had a shoe box that was opened and showed the man holding numerous rubber banded stacks of cash in his hand. Investigators noted that the United States Currency was packaged consistent with drug proceeds. As previously noted, investigators are aware that individuals involved in drug trafficking are frequently in possession of large amounts of United States Currency.




***Surveillance of ALBRECHT-Facundo on September 14, 2023, and His Possession of Firearms***

36. On September 14, 2023, an SIU investigator conducted surveillance at **8360 28th Avenue, Kenosha, Wisconsin (Target Location)**. During surveillance, investigators observed ALBRECHT-Facundo arrive at the residence in **Target Vehicle 1.** After entering **8360 28th Avenue, Kenosha, Wisconsin (Target Location)** for approximately 1-2 minutes, ALBRECHT-Facundo exited the residence and re-entered **Target Vehicle 1**. The SIU investigator observed that when ALBRECHT-Facundo exited the residence and approached **Target Vehicle 1**, he was carrying a black bag which appeared to be weighted down. The SIU investigator observed ALBRECHT-Facundo place the bag in the rear driver's side passenger compartment. **Target**

**Vehicle 1** then left the residence, with the bag still in the rear passenger seat and ALBRECHT-Facundo as the sole occupant and driver.

37. Utilizing the aforementioned MTD, the SIU investigator followed ALBRECHT-Facundo. The SIU investigator ultimately followed ALBRECHT-Facundo to 5 Star Firearms, located at 41666 N. Sheridan Road, Zion, IL. According to their website, 5 Star Firearms is a "full service gun store and state-of-the-art 16 lane firing range." The SIU investigator did not observe ALBRECHT-Facundo enter 5 Star Firearms, but observed it was unoccupied in the parking lot (the parking lot is only utilized by 5 Star Firearms). Surveillance was then terminated for the day.

38. Following the surveillance, investigators conducted a further query of the aforementioned Snapchat return. During the review, investigators located a screenshot of a text message conversation from November 2022, where ALBRECHT-Facundo stated "I have guns…"

39. Likewise, SOI-1 previously informed investigators that ALBRECHT-Facundo is in possession of numerous firearms. SOI-1 also provided at least one photograph to investigators that ALBRECHT-Facundo previously sent to SOI-1. In the picture, which is below, is a picture of 3 handguns. SOI-1, as previously mentioned, also provided a picture of a large gun safe which ALBRECHT-Facundo utilizes to store his guns and drugs.






40. A query of ALBRECHT-Facundo's criminal history revealed that ALBRECHT-Facundo is a convicted felon and is disqualified from possessing any firearms. In particular, according to his criminal history report, ALBRECHT-Facundo was convicted on August 15, 2016, for Felony Substantial Battery – Intend Bodily Harm and was given a fine, restitution and court costs. Investigators have been unable to find anything to indicate that ALBRECHT-Facundo is no longer a felon and is legally allowed to possess firearms. Likewise, as previously documented, BENJAMIN has several felony convictions and is also not legally allowed to possess firearms.

41. Based on the aforementioned information, I believe that ALBRECHT-Facundo is in possession of numerous firearms, despite not being legally allowed to possess firearms, and those firearms are being stored within **8360 28th Avenue, Kenosha, Wisconsin (Target Location)**.

***Surveillance of 8360 28th Avenue, Kenosha, Wisconsin (Target Location) on September 26, 2023***

42. On September 26, 2023, an SIU investigator conducted surveillance at **8360 28th Avenue, Kenosha, Wisconsin (Target Location)**. As am SIU investigator was arriving, the investigator observed a silver SUV parked directly in front of **8360 28th Avenue, Kenosha, Wisconsin (Target Location)**. The SIU investigator observed the brake lights in the SUV were still illuminated and the front passenger door of the SUV was closing, as if someone had just entered the SUV. The SIU investigators observed the brake lights remained illuminated.

43. Approximately a minute and half later, the SIU investigator observed BENJAMIN exit the front passenger seat of the SUV and walk in the front door of **8360 28th Avenue, Kenosha, Wisconsin (Target Location).** Simultaneously, the SUV began to drive way and was followed by the SIU investigator for a short time being surveillance was terminated. However, as the investigator was leaving, he observed BENJAMIN was walking back into **8360 28th Avenue, Kenosha, Wisconsin (Target Location)**. The SIU investigator was unable to see if BENJAMIN was carrying anything but did observe he was wearing what appeared to be pajamas.

44. A query of the license plate associated with the SUV revealed the SUV belongs to an 80-year-old female. However, the SIU investigator observed the sole occupant of the SUV to be a younger male subject, believed to be the female's son. A query of the suspected male driver through internal KPD databases revealed that he has previously been accused on several occasions of using drugs, however, the subject has no drug related criminal history.

45. Based on training, experience, conversations with other experienced law enforcement officers, and my knowledge of this case, I believe the SUV was at **8360 28th Avenue, Kenosha, Wisconsin (Target Location)** for the purpose of obtaining drugs. While investigators did not observe BENJAMIN entering the SUV, they did observe the door closing

indicating that BENJAMIN had just entered the SUV. Further, given the short period of time the SUV was there before departing, BENJAMIN's attire, investigators knowledge that drugs are stored at **8360 28th Avenue, Kenosha, WI (Target Location),** and KPD reporting that the suspected driver of the SUV is a drug user, I believe the purpose of the SUV being at **8360 28th Avenue, Kenosha, WI (Target Location)** was to obtain drugs from BENJAMIN. Likewise, I believe because the transaction happened in front of **8360 28th Avenue, Kenosha, WI (Target Location)**, the drugs were being stored at **8360 28th Avenue, Kenosha, WI (Target Location)**.

**COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS**

46. As described above and in Attachment B, this application seeks permission to search for records that might be found on the persons, premises, and property, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

47. Case agents know that electronic devices, including but not limited to laptop computers, desktop computers, cellular telephones, and tablets used in these locations utilizing these IP addresses will contain evidence. These devices were used to check the status of drug shipments, communicate with undercover agents, send photographs of drug parcels and shipping labels, and manage financial accounts. For that reason, case agents believe the devices would also be used to capture and transmit the drug photographs, communicate about the drugs orders, identify customers and sources of supply, show communications between co-conspirators, and identify the location of controlled substances and drug proceeds.

48. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

49. **Probable Cause**. I submit that if a computer or storage medium is found on the premises, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

50. **Forensic Evidence**. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the premises because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and

malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f. I know that when an individual uses a computer the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

51. **Necessity of Seizing or Copying Entire Computers or Storage Media**. In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with

the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

52. **Nature of Examination**. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying

storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

53. Because several people share the various premises as a residence, it is possible that the premises will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

**FINGERPRINT SENSORS AND FACIAL RECOGNITION**

54. In my training and experience, it is likely that the person, premises, and property will contain at least one Apple brand device, such as an iPhone or iPad, or another electronic device with fingerprint sensors (referred to as "Touch ID") or facial recognition (referred to as "Face ID"), as discussed below. According to information obtained from SOI-1, ALBRECHT-Facundo's cellular device assigned call number 262-331-9361 is an Apple iPhone.

55. Based on my training and experience, I know that an Apple iPhone has the capability to serve as a wireless telephone, digital camera, portable media player, GPS, PDA, and tablet, and that an Apple iPhone is a storage medium, which can connect to the Internet using an IP address. I know from my training and experience, as well as from information found in publicly available materials including those published by Apple, that some models of Apple devices such as iPhones, iPads, and MacBook Pros, offer their users the ability to unlock the

device via the use of a fingerprint or thumbprint (collectively, "fingerprint") in lieu of a numeric or alphanumeric passcode or password. This feature is called Touch ID.

56. If a user enables Touch ID on a given Apple device, he or she can register multiple fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) found at the bottom center of the front of the device or directly on the screen.

57. In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode or password must be used instead. These circumstances include: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in multiple hours and the passcode or password has not been entered in the last several days. Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time. Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

58. Fingerprint sensors (such as Touch ID) are also common on other manufacturer's cellular devices, such as the Samsung Galaxy S21, OnePlus 8, 8T, and 8 Pro, Asus ROG Phone 3, Motorola Edge Plus, Samsung Galaxy Note 20, LG V60, and tablets, such as the Samsung Galaxy Tab S7 and the Lenovo Tab P11. Those other devices have similar security safeguards as Apple devices.

59. I also know from training and experience, as well as from information found in publicly available materials including those published by Apple, that some models of Apple

devices such as iPhones and iPads offer their users the ability to unlock the device via the use of facial recognition in lieu of a numeric or alphanumeric passcode or password. This feature is called Face ID.

60. If a user enables Face ID on a given Apple device, he or she can register multiple faces that can be used to unlock that device. The user can then use any of the registered faces to unlock the device by using the device's camera to capture a registered face.

61. In some circumstances, facial recognition cannot be used to unlock a device that has Face ID enabled, and a passcode or password must be used instead. These circumstances include: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Face ID in 4 hours and the passcode or password has not been entered in the last several days. Face ID will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; (3) five unsuccessful attempts to unlock the device via Face ID are made; or (4) after a user has initiated a power off or Emergency SOS feature.

62. Facial recognition (such as Face ID) is also common on other manufacturer's cellular devices, such as the Huawei Mate, Samsung Galaxy S10, and OnePlus 6T, and tablets, such as the Samsung Galaxy Tab 10.5 and the Microsoft Surface Pro 6. Those other devices have similar security safeguards as Apple devices.

63. In my training and experience, users of devices that offer fingerprint sensors or facial recognition often enable it because it is considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the

device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

64. Based on my training and experience, I know that cellular phones and tablets are in common use, and Touch ID and Face ID are a common feature on cellular phones and tablets.

65. The passcode or password that would unlock the devices with fingerprint sensors or facial recognition found during the search of the persons, premises, and property is not known to law enforcement. Thus, it will likely be necessary to press the finger(s) of the user(s) of the device(s) found during the search of the persons, premises, and property to the device's fingerprint sensor or capture the face of the user(s) of the device(s) found during the search of the persons, premises, and property to the device's camera in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. Attempting to unlock the relevant device(s) via fingerprint sensors with the use of the fingerprints of the user(s) or facial recognition by capturing the face of the user(s) is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

66. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device via a fingerprint sensor, or whose face are among those that will unlock the device via facial recognition. It is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common

area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require ALBRECHT-Facundo and BENJAMIN to press his finger(s) against the fingerprint sensor or to present his face to the facial recognition sensor of the relevant device(s) found during the search of the persons, premises, and property in order to attempt to identify the device's user(s) and unlock the device(s).

67. Although I do not know which of a given user's 10 fingerprints is capable of unlocking a particular device, based on my training and experience I know that it is common for a user to unlock a device with a fingerprint sensor using the fingerprints on thumbs or index fingers. In the event that law enforcement is unable to unlock the device(s) found in the persons, premises, and property as described above within the number of attempts permitted by the device(s), this will simply result in the device requiring the entry of a password or passcode before it can be unlocked.

68. Due to the information above and below, I request that the Court authorize law enforcement to press the fingers (including thumbs) of ALBRECHT-Facundo and/or BENJAMIN to the fingerprint sensor or to present their face to the facial recognition sensor of the device(s) found at the persons, premises, and property for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

**Summary**

69. Since April 2023, investigators have been investigating the ALBRECHT-Facundo DTO, a DTO operating in Kenosha, WI and distributing cocaine throughout the community. During the investigation, investigators cultivated multiple different sources with knowledge of the ALBRECHT-Facundo DTO. Utilizing one of those sources, investigators purchased cocaine directly from ALBRECHT-Facundo, who utilized **Target Vehicle 1** to transport the drugs to

meeting from ALBRECHT-Facundo's storage location (and residence) at **8360 28th Avenue, Kenosha, WI (Target Location)**. Subsequent surveillance identified BENJAMIN as a co-conspirator and roommate of ALBRECHT-Facundo at **8360 28th Avenue, Kenosha, WI (Target Location).** Investigators observed BENJAMIN conduct a suspected drug transaction at **8360 28th Avenue, Kenosha, WI (Target Location)** and **Target Vehicle 2.** Likewise, a search of ALBRECHT-Facundo's Snapchat account revealed additional drug trafficking related activity, especially associated with **8360 28th Avenue, Kenosha, WI (Target Location).** As such, investigators believe **8360 28th Avenue, Kenosha, WI (Target Location)**, **Target Vehicle 1** and **Target Vehicle 2** are utilized to store drugs and/or drug proceeds and a search of those locations will reveal additional items of evidentiary value.

## IV. CONCLUSION

70. Based on the facts contained within this affidavit, I believe that probable cause exists to believe that in the State and Eastern District of Wisconsin, and elsewhere Isaiah ALBRECHT-Facundo and Kendall BENJAMIN knowingly conspired to possess with the intent to distribute cocaine, a Schedule I controlled substance, all in violation of Title 21, United States Code, Sections 841 (a)(1), 841(b)(1)(A), and 846.

71. Based on the facts contained within this affidavit, I further believe that probable cause exists to believe that evidence of the offenses described above will be found in the residence and the detached garage at **8360 28th Avenue, Kenosha, Wisconsin**, to include all associated vehicles parked on the premises (including but not limited to **Target Vehicle 1** and **Target Vehicle 2**), the garage, and outbuildings, at this address. This property is utilized by Isaiah ALBRECHT-Facundo and Kendell BENJAMIN as a storage location for drugs prior to distribution. Based on the ongoing investigation to date, agents believe Isaiah ALBRECHT-

Facundo and Kendell BENJAMIN to distribute large amounts of cocaine throughout Kenosha, Wisconsin. Agents are aware that large scale drug traffickers commonly maintain ledgers to record their narcotics distribution and may keep these ledgers in their residences or vehicles.

<u>**ATTACHMENT A1**</u>

**Property to Be Searched**

The Location at **8360 28th Ave, Kenosha, Wisconsin (Target Location)**, to include all associated vehicles parked on the premises, the detached garage, and outbuildings, at this address The Location is described as a single-story Location, with the front door of the Location facing east and a driveway on the northside of the Location. The Location is light (white or light greyish) in color with brown shutters around the windows, a black roof, and the numbers "8360" vertically next to the front door of the Location.

## ATTACHMENT A2

**Property to Be Searched**

A white**, 2014 Honda Ridgeline Truck**, bearing Wisconsin license plate MV4100, registered to Lot 31 LLC, 5616 Green Bay Rd #A, Kenosha, Wisconsin. **(Target Vehicle 1).**

**ATTACHMENT A3**

**Property to Be Searched**

A white, 2013 Lexus GS, bearing Wisconsin license plate ASE2631, registered to Tonya TAYLOR at 5618 34th Avenue, Kenosha, Wisconsin. **(Target Vehicle 2).**

# <u>ATTACHMENT B</u>

**Property to Be Seized**

1. All records, documents, evidence, and information relating to violations of Title 21, United States Code, Sections 841(a)(1), 843(b), and 846, and Title 18, United States Code, Section 1956, those violations involving Isaiah ALBRECHT-Facundo and Kendell BENJAMIN, and others known and unknown, and occurring after January 1, 2020, including:

   a. Controlled substances, including tablets, powder, liquids, and vape cartridges;
   b. Paraphernalia associated with the manufacture and distribution of controlled substances, including scales, measuring devices, weighing devices, packaging materials, and containers, bags, or boxes to hold or transport controlled substances;
   c. Proceeds of drug trafficking activities, such as currency, precious metals, financial instruments, jewelry, and documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds of drug trafficking activities;
   d. Bank account records, loan documents, wire transfer records, money order receipts, postal express mail envelopes, bank statements, safe deposit box keys and records, money containers, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the sale of controlled substances, or financial transactions related to the trafficking of controlled substances;
   e. Drug or money ledgers, drug distribution or customer lists, drug supplier lists, correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity, or times when controlled substances were obtained, transferred, sold, distributed, or concealed;
   f. Personal telephone books, address books, telephone bills, photographs, letters, cables, telegrams, facsimiles, personal notes, documents, and other items or lists reflecting names, addresses, telephone numbers, addresses and communications

regarding illegal activities among and between members and associates involved in drug trafficking activities;

g. Records of off-site storage locations, including but not limited to safe deposit box keys and records, and records and receipts and rental agreements for storage facilities;

h. Records and information related to travel for purposes of drug trafficking, such as passports, airline tickets, bus tickets, vehicle rental receipts, credit card receipts, taxicab receipts, hotel, and restaurant receipts, canceled checks, maps, and records of long-distance calls reflecting travel;

i. Indicia of occupancy, residency, or ownership of the premises and things described in the warrant, including utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease, or rental agreements, addressed envelopes, escrow documents, and keys;

j. Photographs, videotapes, or other records of assets, co-conspirators, or controlled substances;

k. Cellular telephones, text messaging systems, desktop computers, laptop computers, tablets, other communication devices, and electronic storage devices (including but not limited to thumb drives, compact discs, DVDs, floppy discs, external hard drives), and any and all records associated with and stored within such communications services or storage devices;

l. Records and information relating to a conspiracy to distribute, manufacture, dispense, or possess with the intent to manufacture, distribute, or dispense a controlled substance;

m. Records and information relating to the distribution, manufacture, dispensing, or possession with the intent to manufacture, distribute, or dispense a controlled substance;

n. Records and information relating to the use, dominion, and control of the above-described vehicles;

o. Records and information relating to the use, dominion, and control of **8360 28th Ave, Kenosha, Wisconsin**;

p. Records and information about customers, including lists of customers and related identifying information;

q. Records and information relating to the types, amounts, and prices of drugs imported, trafficked, and distributed as well as dates, places, and amounts of specific transactions;

r. Records and information relating to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

s. Safe deposit box keys, storage locker keys, safes, and related secure storage devices, and documents relating to the rental or ownership of such units;

t. currency counters;

u. Firearms, ammunition, magazines, cases, boxes, holsters, slings, gun pieces, gun cleaning items or kits, ammunition belts, original box packaging, targets, expended pieces of lead, and records, receipts, or other paperwork showing the purchase, storage, disposition, or dominion and control over firearms and ammunition; and

v. Computers (including cell phones) or storage media used as a means to commit the violations described above.

- For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

    a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h. evidence of the times the COMPUTER was used;

i. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k. records of or information about Internet Protocol addresses used by the COMPUTER;

l. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

m. contextual information necessary to understand the evidence described in this attachment.

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high-speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term “storage medium” includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media

As used above, the terms “records” and “information” include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data), any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies), any handmade form (such as writing), and any mechanical form (such as printing or typing).

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

During the execution of the searches described in Attachments A, law enforcement personnel may require Isaiah ALBRECHT-Facundo and Kendell BENJAMIN to press their fingers (including thumbs) to the fingerprint sensor and/or to present his face to the facial recognition sensor, such as a camera, of the electronic device(s) found therein for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.